**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　*Plaintiff*,<br><br>　v.<br><br>ALL VIRTUAL CURRENCY SEIZED FROM ONE MEXC ACCOUNT ENDING IN 8248, ONE MEXC ACCOUNT ENDING IN 7017, ONE BINANCE ACCOUNT ENDING IN 8327, AND ONE BINANCE ACCOUNT ENDING IN 5064,<br><br>　　　　*Defendant*. | Civil Action No. 24 - 3309 (LLA) |

**<u>MEMORANDUM OPINION</u>**

The United States of America brought this civil forfeiture action *in rem* against virtual currency that it seized from four accounts: a MEXC account ending in 8248, a MEXC account ending in 7017, a Binance account ending in 8327, and a Binance account ending in 5604 (the "Defendant Property").  ECF No. 1.  The Clerk of Court entered default, ECF No. 7, and the United States now moves for a default judgment and a final order of forfeiture pursuant to Federal Rule of Civil Procedure 55(b), 18 U.S.C. § 981(a)(1)(A) and (C), and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules"), ECF No. 9.  The United States argues that the Defendant Property is subject to forfeiture because it "contains proceeds that were obtained from wire fraud [and] conspiracy to commit wire fraud" and "is property involved in or traceable to money laundering."  ECF No. 9 ¶ 13; *see* ECF No. 1 ¶¶ 31-36.  For the reasons explained below, the court will grant the motion.

## I.    FACTUAL BACKGROUND

The court draws the following facts, which it accepts as true for the purpose of assessing the default judgment motion, from the United States' verified complaint. *See United States v. Oil Tanker Bearing Int'l Mar. Org. No. 9116512*, 480 F. Supp. 3d 39, 43 (D.D.C. 2020) ("Once default is entered, the defendant 'is deemed to admit every well-pleaded allegation in the complaint.'" (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001))).

This case concerns theft of virtual currency[1] by a North Korean military hacking group, CryptoMimic.  ECF No. 1 ¶ 15.[2]  CryptoMimic began targeting banks and virtual currency exchanges[3] as early as 2014, and between 2017 and 2024, it stole hundreds of millions of dollars from virtual asset service providers and other victims. *Id.*

Between October and December 2023, the FBI interviewed several individuals employed by virtual asset service providers whose computers had been compromised by malware and identified a common pattern resulting in the theft of virtual currency. *Id.* ¶ 18.  The typical scheme proceeded as follows: First, a North Korean actor created a fake online persona, pretending to work at a venture capital firm with a reputation for investing in virtual currency companies. *Id.*  The imposter used the persona to contact virtual currency executives and offer to meet with them about a potential investment. *Id.*  The imposter then sent a link purportedly inviting the executive to a video meeting, but the link would display an error message. *Id.*  The imposter offered to "help"

---

[1] The United States defines virtual currency as a digital representation of value that is non-fiat, meaning it is neither issued nor guaranteed by any jurisdiction.  U.S. Dep't of Treasury, Off. of Foreign Assets Control, *Questions on Virtual Currency*, https://perma.cc/S8CW-UAWT.

[2] CryptoMimic is also known as the Lazarus Group and APT38.  ECF No. 1 ¶ 17.  The court will use the name "CryptoMimic" throughout this opinion.

[3] A virtual currency exchange is a platform that allows individuals to trade virtual currencies including, as relevant here, Bitcoin, Ether, Tether, and NFPrompt.  ECF No. 1 ¶ 13.

the executive by sending a file of computer code, known as a script, to run on the executive's computer. *Id.* When the executive ran the script, it actually downloaded malware from a server CryptoMimic controls. *Id.* The cyber actor could then steal the executive's private computer files and gain access to his company's cryptocurrency. *Id.*

In March 2024, the FBI received a complaint that COMPANY-2 had fallen victim to CryptoMimic's scheme and lost approximately $34 million in virtual currency. *Id.* ¶¶ 20-24. The FBI interviewed the affected employee, who described the fraud, and analyzed data indicating that the employee's computer had connected to two of CryptoMimic's servers at least eighteen times between March 11 and March 13, 2024. *Id*. ¶ 23. The employee maintained a text file on their compromised computer containing the private keys to approximately 5,000 virtual currency addresses holding millions of dollars' worth of NFPrompt, a cryptocurrency native to COMPANY-2's platform.[4] *Id.* ¶ 22. After the hack, that file was deleted, meaning that COMPANY-2 lost access to its cryptocurrency. *Id*.

The FBI traced much of the stolen property—about $17 million worth of NFPrompt across approximately 2,600 virtual currency addresses—to one virtual currency address. *Id.* ¶ 25. From there, the FBI traced the NFPrompt's distribution to several other virtual currency addresses, including to the four accounts at issue in this case. *Id.* MEXC and Binance voluntarily froze the four accounts, but by the time of the seizure, the perpetrators had withdrawn substantial funds from at least two of the accounts. *Id.* ¶¶ 26-30. As of November 15, 2024, the Defendant Property consisted of:

---

[4] A virtual currency address is "an alphanumeric identifier that represents a potential destination for a digital currency transfer," or a unique address where virtual currency is stored. *See Questions on Virtual Currency*, *supra* n.1.

- $1,064,489.29 worth of Bitcoin and $341,756.79 worth of Ether in MEXC Account x8248;

- $48,721.22 worth of Tether, $446,439.05 worth of Ether, and $328,907.83 worth of NFPrompt in MEXC Account x7017;

- $90,969.55 worth of Tether in Binance Account x8327; and

- $706,920.00 worth of Bitcoin and $314,376.51 worth of Tether in Binance Account x5604.

*Id.* ¶ 13.

## II.    PROCEDURAL HISTORY

On November 21, 2024, the United States filed a verified complaint for forfeiture in a civil action *in rem* against the Defendant Property.  ECF No. 1.  The United States also requested a warrant *in rem* to issue against the funds, ECF No. 2, and the Clerk of Court issued a warrant one day later, ECF No. 3.  On January 17, 2025, the United States posted notice of this action on the official government forfeiture website, www.forfeiture.gov, where it remained for thirty consecutive days.  *See* ECF No. 4-1.  No claims were filed, ECF No. 6 ¶ 4, and the Clerk of Court entered default on April 18, 2025, ECF No. 7.  The United States thereafter moved for a default judgment and an order of forfeiture of the Defendant Property.  ECF No. 9.  In February 2026, the court issued an order directing the United States to show cause why venue is proper in the District of Columbia, *see* Feb. 25, 2026 Minute Order, to which the United States responded, ECF No. 11.

## III.    LEGAL STANDARD

A plaintiff must complete two steps to obtain a default judgment.  First, the plaintiff must ask the Clerk of Court to enter default based on a defendant's failure "to plead or otherwise defend" in response to the complaint.  Fed. R. Civ. P. 55(a).  "Upon entry of the default, the factual allegations of the complaint are deemed admitted, which usually establishes the defendant's

liability." *Serv. Emps. Int'l Union Health & Welfare Fund v. N. Am. Cleaning Servs. Co. Inc.*, 264 F. Supp. 3d 1, 4 (D.D.C. 2017). Second, after the Clerk has entered default, the plaintiff must file a motion for default judgment and provide notice of the same to the defaulting party. Fed. R. Civ. P. 55(b)(2). "The determination of whether default judgment is appropriate is committed to the discretion of the trial court." *Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008). A plaintiff is entitled to a default judgment only if the court concludes, taking all factual allegations as true, that the plaintiff has stated a claim upon which relief can be granted. *See United States v. $6,999,925.00 of Funds Associated With Velmur Mgmt. Pte Ltd*, 368 F. Supp. 3d 10, 17 (D.D.C. 2019); *United States v. $601,426.19 of Funds Associated With Dynapex Energy Ltd.*, No. 24-CV-542, 2024 WL 4854310, at *4 (D.D.C. Nov. 21, 2024).

## IV.    DISCUSSION

### A.    Notice

"Before a default judgment is entered pursuant to a complaint for forfeiture *in rem*, the government must show that it complied with the notice requirements contained in the Supplemental Rules." *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38, 46 (D.D.C. 2018). In particular, "Supplemental Rule G(4) requires the government to provide two forms of notice in a forfeiture action in rem: notice to the public via publication and notice to potential claimants via direct notice." *United States v. Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d 1, 5 (D.D.C. 2020); *see* Fed. R. Civ. P. Supp. R. G(4)(a), (b). First, the United States may provide publication notice by publishing notice of the forfeiture "to an official internet government forfeiture site for at least 30 consecutive days." Fed. R. Civ. P. Supp. R. G(4)(a)(iv)(C). That notice must "describe the property, state the time to file

a claim and answer, and name the government attorney to be served with the claim and answer."

*$601,426.19 of Funds Associated With Dynapex Energy Ltd.*, 2024 WL 4854310, at *5 (quoting

*Twenty-Four Cryptocurrency Accts.*, 473 F. Supp. 3d at 5).  Here, the United States posted notice

of this forfeiture proceeding on an official government website, http://www.forfeiture.gov, for

thirty consecutive days (from January 17, 2025 through February 15, 2025).  ECF No. 4-1.  The

notice stated the grounds for forfeiture and provided that "[a]ny person claiming a legal interest in

the Defendant Property must file a verified Claim with the court within 60 days from the first day

of publication."  *Id.* at 2.  This publication satisfied Supplemental Rule 4(G)(4)(a).

Second, the United States must send direct notice to "any person who reasonably appears

to be a potential claimant."  Fed. R. Civ. P. Supp. R. G(4)(b)(i).  Actual notice is not required, but

the notice "must be sent by means reasonably calculated to reach the potential claimant."  *Id.* Supp.

R. G(4)(b)(iii)(A).  In this case, the United States sent direct notice to NFPrompt via e-mail in

January 2025.  ECF No. 9 ¶ 11; *see id.* ¶ 2 (noting that NFPrompt did not file a claim with respect

to the Defendant Property but submitted a petition for remission); ECF No. 9-1 (notice sent to

NFPrompt).  While the United States does not expressly state why NFPrompt is a potential

claimant, the complaint indicates that the virtual currency at issue was stolen from NFPrompt.

ECF No. 1 ¶¶ 20-24 (describing how cyber actors stole "addresses holding COMPANY-2's native

token"), ¶ 25 (explaining, in a section titled "Tracing the Stolen COMPANY-2 Funds," that the

cyber actors "stole approximately 19 million NFP . . . from a total of approximately 2,600 separate

virtual currency addresses").  Accordingly, the court concludes that the United States has satisfied

the notice requirements of Supplemental Rule G.

## B.    Adequacy of the Complaint

In civil forfeiture actions arising under a federal statute, Supplemental Rule G sets forth the pleading requirements. Fed. R. Civ. P. Supp. R. G(1); *see $601,426.19 of Funds Associated With Dynapex Energy Ltd.*, 2024 WL 4854310, at *4. As relevant here, the complaint must "be verified," state the grounds for jurisdiction and venue, "describe the property with reasonable particularity," "identify the statute under which the forfeiture action is brought," and "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2).

"The first four requirements of the complaint are largely formal and are easily met here." *$6,999,925.00 of Funds Associated With Velmur Mgmt. Pte Ltd*, 368 F. Supp. 3d at 19. First, the United States filed a verified complaint identifying 18 U.S.C. § 981(a)(1)(A) and (C) as the statutory bases for forfeiture. ECF No. 1 ¶¶ 5-6, 31-36. Second, the United States correctly asserts that the court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the proceeding was "commenced by the United States." ECF No. 1 ¶ 1. The court also has original jurisdiction pursuant to 28 U.S.C. § 1355(a) because this is an action for forfeiture incurred under an Act of Congress and does not fall within the exceptions for actions belonging exclusively in the Court of International Trade. *Id.* ¶¶ 1, 31-36 (seeking forfeiture under two federal statutes for violations of federal law). And the court has *in rem* jurisdiction because the Defendant Property is in the District of Columbia and thus "within the court's territorial jurisdiction." *United States v. All Funds in Acct. Nos. 747.034/278, 747.009/278, & 747.714/278 Banco Espanol de Credito, Spain*, 295 F.3d 23, 25 (D.C. Cir. 2002); *see* ECF No. 11 (clarifying that the Defendant Property "is held by the Federal Bureau of Investigation at the Washington Field Office in Washington, D.C."). Third, venue is proper in the District of Columbia because it is the "judicial

district . . . into which the [Defendant Property] [was] brought" after being seized.  28 U.S.C. § 1395(c); *see* ECF No. 1 ¶ 14 (noting that the Defendant Property is in FBI custody); ECF No. 11 (noting that the Defendant Property was brought into the District of Columbia).  Fourth, the United States has described the Defendant Property with particularity.  *See* ECF No. 1 ¶¶ 13-14, 25-30.

The final requirement is that the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Fed. R. Civ. P. Supp. R. G(2)(f).  "The government's burden at trial is to prove that the assets are subject to forfeiture by a preponderance of the evidence."  *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 197 (D.D.C. 2014); *see* 18 U.S.C. § 983(c)(1).  This is not an "'an onerous standard,' but instead establishes a 'low bar' that is appropriate at the default judgment stage 'where a court should exercise greater flexibility in judging factual allegations.'"  *Approximately 1,467,761.163191 USDT*, 2026 WL 320193, at *4 (quoting *$1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d at 51-52).

The United States principally alleges that the Defendant Property was obtained through wire fraud.  ECF No. 9 ¶ 13; ECF No. 1 ¶¶ 3, 31-36.  Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) if it "constitutes or is derived from proceeds traceable to violation of" various statutes, including "specified unlawful activity" as defined in 18 U.S.C. 1956(c)(7).  Section 1956(c)(7), in turn, defines "specified unlawful activity" as "any act or activity constituting an offense listed in [18 U.S.C. §] 1961(1) of this title."  Section 1961(1) includes a laundry list of criminal laws, including 18 U.S.C. § 1343, which criminalizes use of the wires to execute a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  Accordingly, wire fraud proceeds are subject to forfeiture under Section 981(a)(1)(C).

The complaint explains that law enforcement identified a pattern of deception that CyberMimic used to obtain virtual currency, ECF No. 1 ¶¶ 18-19, and that CyberMimic used such a scheme to obtain virtual currency from COMPANY-2, *id.* ¶¶ 21-24. The scheme relied on electronic deception several times over: cyber actors impersonated a potential investor online so that COMPANY-2's executive would want to meet with him; they intentionally sent a faulty link purporting to invite the executive to a videoconference; they sent malware through a script purporting to fix the faulty link, but which actually installed malware on the executive's computer; and they used that malware to obtain money in the form of virtual currency. *Id.* ¶¶ 20-25. And the "particular focus" of CyberMimic was "to steal money and virtual currency from their victims." *Id.* ¶ 15. The Defendant Property is thus directly traceable to the wire fraud through a series of virtual currency trades. *Id.* ¶ 25. The allegations in the complaint readily establish a reasonable basis that the United States could show at trial that the Defendant Property constitutes or is derived from proceeds traceable to wire fraud in violation of 18 U.S.C. § 1343, which renders the Defendant Property forfeitable under 18 U.S.C. § 981(a)(1)(C).[5]

---

[5] Having concluded the United States has established a reasonable basis for forfeiture under Section 981(a)(1)(C), the court need not assess whether the United States has established a basis for forfeiture on its remaining allegation. *See, e.g.*, *Approximately 1,467,761.163191 USDT*, 2026 WL 320193, at *4-5 (taking a similar approach).

## V.    CONCLUSION

For the foregoing reasons, the court will grant the United States' Motion for Default Judgement.  ECF No. 9.  A contemporaneous order will issue.

_____
LOREN L. ALIKHAN
United States District Judge

Date:   March 17, 2026